# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

EMMANUEL EDWARD SEWELL #266100   :
    Plaintiff
                                                 :

      v.                                             Civil Action No.  DKC-09-693
                                               :

JOHN A. ROWLEY, et al.
    Defendants                             ******

**MEMORANDUM OPINION**

Pending is Emmanuel Edward Sewell's ("Sewell") pro se prisoner civil rights complaint pursuant to 42 U.S.C. § 1983.[1] Defendants John A. Rowley, former Warden of the North Branch Correctional Institution (NBCI),[2] Sergeant Patrick Speir, Sergeant Robert Werner, Sergeant Vaughn Whiteman, Officer Brian Iames, Officer Roman Raley, and Officer Bryan Walker ("State Defendants") move for dismissal or, in the alternative, for summary judgment. Defendant Correctional Medical Services Inc. ("CMS") separately moves to dismiss or, in the alternative, for summary judgment. Plaintiff has responded to the dispositive motions.[3] Paper Nos, 41, 48, and 49. After considering the pleadings, exhibits, and applicable law, the court determines that a hearing is not necessary and summary judgment will be granted in favor of the State Defendants and CMS.

---

[1] On May 29, 2009, the court appointed counsel in this case. On November 16, 2009, Sewell moved for appointment of different counsel, stating that his appointed pro bono counsel had placed him "in clear deprivation and disadvantage" by "failing to provide competent representation." Paper No. 37. Sewell accused his counsel of "co-conspiring" with the Department of Correction to "sabotage" the case and counsel moved to withdraw in light of the strained attorney-client relations, filing a Motion for Withdrawal of Counsel based on "irreconcilable differences [that] have arisen between counsel and Mr. Sewell." Paper No. 38. The court granted counsel's motion to withdraw and denied Sewell's request for to reappoint counsel. Paper No. 39.

[2] Rowley was Warden at the time of the excessive force incident at issue. Bobby Shearin is presently warden at NBCI.

[3] Sewell's eleventh-hour attempt to amend the complaint to add a litany of new defendants (Papers No. 48, p. 2 and 49, p. 2) will be denied. Sewell fails to raise specific allegations against these individuals and fails to provide any basis for his belated attempt to add them as party defendants. To the extent Sewell wants to raise new claims concerning retaliation, failure to medically treat penile bleeding, lack of mental health care, and prison overcrowding (Papers No. 48 and 49), he may do so in separate prisoner civil rights actions.

I.  Plaintiff's Claims

Sewell raises claims of excessive force and inadequate medical treatment arising from a use of force incident on January 20, 2009. He requests compensatory and punitive damages and injunctive relief.[4]

I.  Background

    A.  Use of Force

Sewell describes the incident as follows:

> On January 20th, 2009 defendants Iames, Raley, McKenzie, Shoemaker, Adams, Walker, Houser, Sgt's Werner, Whiteman, Speirs and 5-7 unidentified officers was [sic] working unit IB tier, i.e.,violently, extracting inmates by forcibly double ceiling. Officer Iames had the control center open cel113-16 while inmate Sewell was in the cell uncuffed. When Inmate Sewell began to explain to the officer his status, the Officer Iames in his crazed actions just started throwing clenched fists punches at inmate Sewell. In self defense I (Sewell) pushed the officer off of me when all of a sudden multiple officer is flooded the cell bombarding the inmate with punches to the head, face, back and ribs.
>
> I then fell to the floor, then Officer Iames grabbed a handful of my crotch and told me to put my hands behind my back. Once handcuffed, I began to receive kicks to my head, face. and was being kneed in the ribs; at no time resisting the officer's [sic].The beating continued, yet there was "no plausible basis" for prison officials to believe the use of force was necessary. After a considerable amount of time I was dragged to the back the cell until someone realized that I was bleeding profusely, then I was pulled up from the floor and a shock shield was applied to me while escorted to A and B corridor. I was then pushed to my knees and then officer Walker began to beat me continuously with his fists or something atop my head. Officer Walker then asked Sgt. Whiteman. "how does this work?" and then began to electrocute me for about 10-15 minutes; the RN Rachel had not showed up yet.

---

4  To the extent Sewell requests transfer from NBCI because the "officers who assaulted me are still working around me," he provides no facts to support any suggestion that he is in danger of harm. Complaint, p. 2; *see also* Papers No. 36 and 48. Sewell's conclusory accusation provides no grounds for injunctive relief. Verbal harassment or threats against inmates are not actionable under § 1983. *See Barney v. Pulsipher*, 143 F.3d 1299, 1310 n. 11 (10th Cir.1998); *accord Shabazz v. Pico*, 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right" under section 1983); *see also McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir.1993); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir.1987); *Cole v. Cole*, 633 F.2d 1083, 1091 (4th Cir.1980). Plaintiff's claims of harassment and threats do not constitute colorable constitutional claims and are subject to dismissal.

Complaint, Attachment, pp. 2-3.

The State Defendants' verified exhibits confirm that use of force against Sewell at NBCI on January 20, 2009, but recount a different version of the incident. Sergeant Werner, Officer Raley, Officer Iames, and Officer McKenzie entered Sewell's cell to inform him that he was assigned a cellmate. Sewell, swinging his fists, charged towards Officer Iames.[5] The officers attempted to restrain Sewell, but he resisted. Sewell struck Officer Raley in the abdomen. As Sewell was taken down to the floor, his face struck the lower bunk in the cell. Sewell was restrained and escorted to the medical unit. Sewell told the nurse that he had hit his head on the metal bunk during the incident. Sewell stated that he "wanted to go home, there was an officer in the way, so he hit him, fell and hit his head on the bunk" and that "he was sorry." State Defendants' Exhibit 1, Use of Force Memorandum; *See also* CMS, Exhibit B, p. 2.

Plaintiff received an infraction for assaulting an officer. Sewell refused to attend the January 29, 2009, infraction hearing. Sewell was found guilty, placed on a term of segregation, and lost good conduct credits. Notably, Sewell did not file any Administrative Remedy Procedure ("ARP") complaints specific to the use of force incident. State Defendants" Exhibits 6-8.[6]

    B. Medical Treatment

Verified exhibits filed by CMS show that Sewell was examined on January 20, 2009, at about 1:00 p.m. by Rachel Warnick, R.N. Examination revealed that Sewell: 1) was alert and oriented; 2) denied nausea and loss of consciousness; 3) had a one inch laceration and two ¼ inch lacerations on his right cheek; 4) showed swelling and bruising on the right eye; 5) had a one-inch

---

[5] Officer Adams, Officer Shoemaker, and Officer House cannot be identified, and have not been served. State Respondents' Memorandum, p. 2  n. 1. Sewell makes no specific allegations against these officers.

curved laceration on his left ear lobe; and 5) had small abrasions to his bottom lip and the top of his head.[7] Nurse Warnick cleaned the abrasions and lacerations and applied a pressure dressing to the cheek lacerations.  CMS Exhibit A,   Lisa Schindler, P.A. examined Sewell, administering Dermabond and Steri-strips[8] to the one inch cheek laceration and ordered x-rays of his skull.  Sewell was informed of the signs and symptoms of head injury. He was instructed to report back if he experienced any symptoms.

Later that day, at approximately 5:00 p.m., Steven Bray, R.N. ("Nurse Bray") was called to Sewell's housing unit after correctional officers reported a decrease in his level of consciousness. Nurse Bray observed Sewell was very lethargic and minimally responsive to a sternum rub, a test in which the breast bone is rubbed very hard to assess pain response.  Sewell's pupils were equal in size, but sluggish; they reacted to light more slowly than normal.  The right eye was swollen shut. The steri-strips on the right cheek were intact and the bleeding was controlled.  Nurse Bray also observed a large hematoma[9] on the back of Sewell's head, which Nurse Warnick indicated had grown since the afternoon.

---

[6]   *See infra*  n. 13.

[7]   The injuries appear consistent with Sewell's statement to Nurse Warnick that he hit his head against the bunk.

[8]   Dermabond is a liquid skin adhesive used to hold skin edges together in lacerations.  Steri-strips are small adhesive strips used to hold skin edges together in lacerations.

[9]   A hematoma is a localized collected of blood, usually clotted, in a tissue or organ.

Nurse Bray faxed information to Wexford Health Services, Inc.,[10] and notified Isaisas Tessema, M.D. of Sewell's condition. Dr. Tessema ordered Sewell transported to the Western Maryland Health System Memorial Hospital where he was admitted on January 20, 2009.

At admission, Sewell was awake and alert, but disoriented in regard to time, place, and person. His neurological status was scored under the Glascow Coma Scale as fourteen out of fifteen, with fifteen the best possible score. He was admitted to the intensive care unit and evaluated by neurosurgery and plastic surgery consultants. CMS, Exhibit B, p. 9. A CT- scan was performed of Sewell's brain. CMS, Exhibit B, p. 13.

Sewell was discharged on January 23, 2009, and instructed to follow-up with prison medical providers. His discharge diagnoses were: 1) concussion; 2) cephalohermtoma; 3) fracture to the bone on the inside of the right eye nearest to the nose; and 4) significant swelling of the right eye. Sewell complained of blurred vision and when standing, mild dizziness. Hospital physicians recommended an ophthalmology consultation when the eye swelling improved. There was no recommendation for surgery. CMS, Exhibit B, pp. 7-11.

Sewell was discharged from the hospital and admitted to the infirmary at the Western Correctional Institution. At admission, he complained of head pain and right facial pain. He did not complain of pain during the rest of the time he was in the infirmary. He was alert and oriented. Plaintiff was prescribed Nubain, a synthetic narcotic, for pain as well as ibuprofen and Excedrin for Migraines.[11] The prison medical staff requested an ophthalmology consultation.

---

[10] As the utilization review contractor for the State of Maryland, Wexford reviews and approves consultations for certain medical tests. CMS is not affiliated with Wexford.

[11] Plaintiff's prior medical record history includes chronic headaches.

Nursing notes dated January 25, 2009, indicate that Sewell had moderate edema (swelling) in his right eye, spoke in full sentences and was alert and oriented. His gait was steady. Sewell reported headaches and decreased vision in his right eye. Steri-strips were in place in the right orbital area. CMS Exhibit B, p. 25. The same day, he was examined by Michael E. Summerfield, M.D., an ophthalmologist. Dr. Summerfield's notes indicate "no surgical intervention for now," and found Sewell at risk for a detached retina. CMS Exhibit B, p. 28. Dr. Summerfield advised Sewell not to blow his nose to avoid increasing intraocular pressure and causing the retina to detach. Further, Dr. Summerfield explained the signs and symptoms of a detached retina to Sewell, and recommended follow-up.

Sewell returned to NBCI on January 29, 2009. He was examined by Dr. Ottey the same day. Dr. Ottey prescribed Tylenol # 3, a narcotic pain medication, for two days as needed and Keflex, an antibiotic, to prevent infection. Dr. Ottey noted Sewell had difficulty walking, and referred him to physical therapy. CMS, Exhibit A. ¶ 7. It does not appear, however, that Sewell received physical therapy. On February 24, 2009, Nurse Warnick observed Sewell's gait was normal. CMS, Exhibit B ¶ pp 38-39.

Sewell's skull was x-rayed on February 3, 2009, and showed was no evidence of fracture. Sewell submitted sick call request forms on February 9 and 10, 2009, complaining that he had not received any medication for his injuries and requesting follow-up. The sick call slips were received in the medical unit on February 12, 2009. On both sick call forms, the nurse noted that Sewell was scheduled to see Dr. Ottey on February 14, 2009.

Dr. Ottey actually examined Sewell on the day before, February 13, 2009. Plaintiff complained of headaches, facial pain, dizziness with vertigo, decreased appetite, constipation, vision

6

changes, and low back pain that increased with certain movements of his right leg. Sewell denied experiencing nosebleeds, numbness, or tingling. His visual acuity tested normal in both eyes. Dr. Ottey noted in the medical chart that Sewell said he had not worn his glasses recently.[12] Further, Dr. Ottey observed Sewell's gait was slow; there was no motor weakness or sensory loss. Dr. Ottey referred Sewell for an optometry evaluation of his visual acuity, continued the Excedrin Migraine and ibuprofen, and prescribed Antivert (meclizine HCL) for dizziness. Sewell was given sixty tablets of Excedrin Migraine and ninety tablets of ibufprofen for pain relief.

On February 19, 2009, Sewell submitted a sick call request form, indicating that he had not received medication for dizziness, "wooziness," and head pain. The medical unit received the form on February 22, 2009. Nurse Warnick examined Sewell on February 24, 2009, at which time he complained of head pain, dizziness and ringing in his ears. She recorded that Sewell's gait was normal and he denied visual disturbance.

On March 1, 2009, Ellen Moyer, R.N. examined Sewell, who complained of dizziness, chills, headache, and a drooping eyelid. Nurse Moyer reported that Sewell's eyelid did not droop, but he looked uncomfortable. His temperature was slightly elevated at 99.7 degrees. She referred him to a physician's assistant for further evaluation.

On March 6, 2009, Sewell submitted a sick call request form complaining that he had not had any pain medication since his return from the hospital. Sewell reported pain around his eye and head that "cannot be explained" and asked to see a specialist. Sewell's vital signs were within normal limits. CMS, Exhibit B, pp. 41-42.

---

[12] Sewell states in his reply that it "took one year to be seen by the optometrist" and he did not receive prescription glasses until February 3, 2010. Paper No. 49, p. 3.

On March 13, 2009, Dr. Ottey examined Sewell who complained of dizziness with vertigo, visual disturbances, and inadequate pain relief. Dr. Ottey reordered all of Sewell's pain medications, but indicated stronger analgesics were unnecessary due to the amount of time that had passed since Sewell had incurred injury. An ophthalmology consultation was ordered.

On March 19, 2009, Dr. Summerfield examined Sewell and noted that his eye was still tender. Dr. Summerfield discussed the symptoms of a retinal detachment and recommended referring Sewell to an optometrist for glasses.

On April 3, 2009, Sewell submitted a sick call request with complaints of ringing in his ears, and a burning and stabbing sensation in his right leg. He was examined by Dr. Ottey on April 7, 2009. Plaintiff reported a burning and stabbing pain in his right thigh with numbness and tingling radiating to his toes. When his spine was pressed during physical examination, Sewell reported feeling pain. Additionally, he reported that his dizziness had improved since taking Antivert. Dr. Ottey prescribed Baclofen, a muscle relaxant, for back pain and Elavil (amitriptyline), an antidepressant also used for nerve pain, to treat the numbness and tingling. CMS, Exhibit A, ¶ 12. On May 11, 2009, Sewell refused follow-up evaluation in the Chronic Care Clinic. He continues to receive Excedrine Migraine and ibuprofen for pain relief.

III. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, "the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir.2002), but the court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 526 (4th Cir. 2003).

IV. Analysis

 A. Claims Against State Defendants

  1. Exhaustion of Administrative Remedies

The State Defendants assert the claims against them should be dismissed because Sewell failed to exhaust available administrative remedies. The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The language of this provision is broadly construed: "[P]rison conditions" encompasse "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, (2002). Exhaustion is mandatory and unexhausted claims may not be brought in court. *See Jones v. Bock*,

549 U.S. 199 (2007); *see also Woodford v. Ngo*, 548 U.S. 81 (2006). Unless Sewell can show that he has satisfied the administrative exhaustion requirement, the claims must be dismissed.

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. In Maryland, filing a request for administrative remedy with the Warden is the first step in the ARP process provided by the Division of Correction. If this request is denied, a prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days to file an appeal to the Executive Director of the Inmate Grievance Office. *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210; Md. Regs. Code Title 12 § 07.01.03.

Although Sewell has filed five ARPs at NBCI, none was submitted in regard to the alleged assault on January 20, 2009.[13] Notably, Sewell filed an ARP about his infraction and the disciplinary hearing, but did not mention improper use of force or denial of medical care related to the use of force incident. Both the Department of Correction Headquarters ARP Coordinator and the Executive Director of the Inmate Grievance Office attest that Sewell did not file a grievance about the January 20, 2009 incident. Although Sewell generally claims prison officials "frustrated his abilities to exhaust" (Paper No. 48, p. 1) he alleges no facts to dispute the affirmative defense; accordingly, the claims against the State Defendants must be dismissed.

---

[13] Sewell filed five ARPs in 2009. ARP NBCI-0505-09 pertained to Sewell's disciplinary hearing and sanctions. State Defendants' Exhibit 6-B. ARP NBCI-0661-09 addressed dietary concerns. ARP NBCI-0665-09 was about medication for a leg injury; it made no mention of use of force or head injury. State Defendants' Exhibit 6-C. ARP NBCI-0984-09 concerned sanctions for inmate rule violations. State Defendants' Exhibit 6-D; and ARP NBCI 1094-09 addressed Sewell's disciplinary hearing. State Defendants' Exhibit 6-E. In 2009, Sewell appealed ARP NBCI-0505-09 (disciplinary hearing), NBCI-0661-09 (dietary), and ARP NBCI-0665-09 (medication for a leg). State Defendants, Exhibit 7. Neither of the two grievances Sewell filed before the Inmate Grievance Office pertained to the January 20, 2009, use of force incident. State Defendants' Exhibit 8, ¶¶ 2-4.

2. Claims Against Defendants Rowley and Speir

The Complaint contains no allegations of wrongful conduct by John Rowley or Patrick Speir. In order to be liable under 42 U.S.C.§ 1983, there must be personal involvement by a defendant in the alleged violation. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994). There is no evidence suggesting that the Warden was involved in the January 29, 2009 incident. Additionally, Sergeant Sepeir has provided a declaration attesting that he was not involved in the January 20, 2009 incident.  Consequently, the claims against both former Warden Rowley and Sergeant Speir are dismissible on this basis.

To the extent Sewell names Rowley as a defendant under a theory of supervisory liability, the doctrine of respondeat superior or vicarious liability does not apply to § 1983 suits.  *See Monell v. Department of Social Services*, 436 U.S. 694 (1978).  There is no allegation that any constitutional violations alleged were instituted pursuant to official policy or that the former warden acted with indifference to his subordinates' actions.

3. Medical Claims Against State Defendants

Prison officials are entitled to rely on the medical judgment of health care providers who treat inmates. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990).  Supervisors are liable if they either failed to timely provide needed care, deliberately interfered with doctors' performance or tacitly authorized or were deliberately indifferent to constitutional violations.  *See id*.  Sewell does not allege the State Defendants were deliberately indifferent to his medical care, and there is no basis for liability.

B.      Medical Claims Against CMS

1.   Respondeat Superior

CMS is a private corporation that contracts with the State of Maryland to provide medical services to inmates in certain state facilities, administering health care only through its agents and employees. As earlier discussed, respondeat superior does not apply to § 1983 claims. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). Because vicarious liability does not apply in a § 1983 action, the claims against CMS must be dismissed.

2.   Eighth Amendment

Even were this matter to proceed, Sewell fails to demonstrate constitutionally inadequate care by medical personnel. To bring an Eighth Amendment medical claim, two elements must be shown. First, there must be a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir.1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir.1998). Second, deliberate indifference by Defendants must be shown. *See Wilson v. Seiter,* 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. "[A]ny negligence or malpractice on the part of ....doctors in missing [a] diagnosis does not, by itself, support an

inference of deliberate indifference." *Johnson v. Quinones* 145 F.3d at 166.

The undisputed and verified medical records filed in this case fail to suggest that conscious disregard of a substantial risk of serious harm, or that treatment was "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F. 2d at 851. Sewell was treated, monitored, and referred for consultations with specialists. He was hospitalized, treated in the infirmary, and provided follow-up care. Sewell's dissatisfaction with his treatment does not amount to a claim of constitutional magnitude.

V.  Conclusion

For the aforementioned reasons, Defendants' Motions to Dismiss or for Summary Judgment, construed as Motions for Summary Judgment, are hereby granted. Judgment is entered in favor of Defendants and against Plaintiff. A separate Order follows.

Date:  March 18, 2010                    _____/s/_____
                                          DEBORAH K. CHASANOW
                                          United States District Judge